[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION B E F 0 R E:
Appearances:
For the plaintiff: James Wu, Esq One Moss Avenue at White Street Danbury, Connecticut 06810
For the defendant: David Ball, Esq. 66 West Street Danbury, CT 06810
For the children: Julie Foster, Esq. 805 No. Salem Road P.O. Box 1067 Ridgefield, CT 06877
 Diana Genovesio Court Recording Monitor One Court Street Middletown, CT 06457
THE COURT: The Court finds it has jurisdiction over the marriage. One party has resided in the state of Connecticut continuously for more than one year prior to the bringing of this action. The parties were married on December 20, 1986 in Auckland, New Zealand. There have been four minor CT Page 5085-kb children born to the parties since the date of the marriage who are alive; and that's James, who was born September 19, 1987; Zoe, who was born March 4, 1991; Harry, who was born July 17, 1992; and Lilly, who was born August 20, 1994. I'm reading off the writ.
ATTORNEY FOSTER: Excuse me, your Honor, I believe Zoe's is March 2nd
ATTORNEY BALL: We'll stipulate to that, your Honor.
ATTORNEY FOSTER: I apologize for interrupting, your Honor.
THE COURT: That's okay, and is there any objection to amending the writ?
ATTORNEY BALL: None on my part, your Honor.
THE COURT: Okay, and you'll waive the 20 day time period?
ATTORNEY BALL: Waived.
THE COURT: The writ is amended to reflect that and the Court strikes the prior finding as to Zoe's birthday. Zoe was born on March 20, 1991.
MS. MALISZEWSKI: No, Lilly was born March 20th
THE COURT: Suspend the decision for a minute. James is September 19th, "87, right?
MS. MALISZEWSKI: Yes.
THE COURT: The writ says Zoe is March 2nd, is that correct?
ATTORNEY FOSTER: That's correct.
THE COURT: That is not amended. The writ says that Harry is July 17th, '92, is that correct?
MS. MALISZEWSKI: Yes.
ATTORNEY FOSTER: Correct.
THE COURT: And the writ says that Lilly is August 20th, and that's suppose to be the March 20th, right?
MS. MALISZEWSKI: No, August 20th, that's correct.
ATTORNEY FOSTER: Your Honor, I may have just misspoke, I believe CT Page 5085-kc you said March 21st for Zoe, and that's March 2nd
THE COURT: Then the birthdays are as indicated and the findings are as indicated, thank you.
No other minor children have been born to the defendant since the date of her marriage with the exception of John and Sam, who were born on October 5, 1988 and deceased on the same date. The defendant is not currently pregnant. The parties have not been recipients of public assistance.
The Court finds, for reasons best known to the parties and as referred to here, that the marriage between the parties has broken down irretrievably; that there is no reasonable hope for it's reconciliation; and, therefore, among other orders, I am going to order now, so that I don't forget to order it later, a dissolution of the marriage with the orders to follow here and after.
The Court makes the following additional findings mindful of the statutory mandates in regard to, and the Court considers, the statutes in case laws construing the statutes regarding a dissolution of marriage; custody of minor children; visitation or access schedule of minor children; child support; health insurance; health expenditures for minor children; insurance for spouses; alimony; life insurance; property settlement as settlement of the marital estate; both assets and liabilities; and counsel fees, both for the parties themselves and for their children.
In regard to each of these statutes the Court has carefully considered the criteria. The Court makes the following additional findings. The plaintiff is 51 years old. He was born on September 22, 1948 in Edinburg, Scotland. The defendant is 38 years old and was born on July 31, 1961 in New Zealand. The parties were married in New Zealand and have been, however, for the time of their marriage, residents of the United States. Both parties are in good health.
The plaintiff holds dual nationality, both a United Kingdom nationality and an American nationality. The defendant is a New Zealand citizen and a permanent resident by way of immigration status in the United States.
While the Court does find that both parties are in good health, the Court notes that it is the plaintiff's position that the defendant may have some kind of medical disorder which explains his view of her anger and volatility as he has related it in his testimony. There is, however, CT Page 5085-kd no medical evidence before the Court to suggest that there is a presence of any such disability or disorder; and the Court finds that based upon the evidence the defendant is in fine health.
The four children in this matter have been variously described in different ways to the Court. It's probably most important to notice that there are indeed two girls and two boys and that they alternate. In other words, it's not that the two youngest are both the girls or the oldest are both the boys, but it's boy/girl, boy/girl. And the age ranges essentially seven years, four children in seven years. None of them are of an age that the Court could construe them able to care take of each other independent of adult supervision at the present time.
James is presently 12 years old, as the oldest, and Lily is still a very emotionally needy age of five. Therefore, whatever arrangements may be made by these Court orders the Court is of their immature years in terms of independence at the present time.
They are also children that the Court finds, based upon all the evidence, that have a high level of interdependence upon each other. And while that interdependence may reflect itself in sometimes aggravating behavior on the one hand, on the other hand it is by all accounts a result of a deeply bred relationship and bond of all four children to each other. And, therefore, these orders will reflect that sense of their intactness as a whole of four children.
The characterization of each of the children probably is the biggest challenge for each parent, because it's almost impossible, the Court would note, to sum up any human being in a 25 words or less type description. And so what the Court gets is brief glimpses or light onto the various personalities of these children. What is clear is that they each have a level of energy that adults would all be envious of and they express it in different ways. Most of the time, the Court notes, it's been expressed in positive ways through outlets, whether they be physical in nature or more cognitive in nature, the children are active in expressing their wants, needs, and own interests.
Much has been made of James, who's 12 years old. And the Court would hazard to believe that if he knew if he got this much attention in the trial he'd probably act out more, since it's clearly his acting out behavior has resulted in him receiving occasionally disproportionate attention in a household of four children. Whether that attention is all positive or not is not necessarily important to a child, it's simply attention. CT Page 5085-kf
And the Court notes that he has probably been challenged the most by his parental conflict, at least in the way he acts out. And the way each of his parents deal with him, separately and differently, has resulted in him continuing to be a lightning rod for their conflict and it's a cycle that for James would probably be best if it ended sooner rather than later.
The Court has some concern, from the brief amount of evidence heard about Zoe, that she actually may be suffering more from this conflict than may have been disclosed in the evidence before the Court. Her emphatic desire of her equality of access is really — may be that on the surface, but it's a desire to be free from the conflict and not be forced to choose sides or pursue loyalties; which indicates that even if neither parent has asked that of the children, they and Zoe, speaking perhaps for herself and for her siblings, implicitly understand as children that's what they are being asked to do, even if it hasn't been verbalized.
That finding is the reason the Court asked about everyone staying in the same house for a couple of months. Somehow you all have managed to accomplish this with what, on the one hand, would seem to be a minimal amount of conflict for your children. In that you're to be congratulated and most people don't do that. On the other hand, the conflict is implicit by your very presence without functioning as a cohesive unit any longer. And as you face the days ahead your need for sensitivity for the children should be accentuated.
Harry and Lily probably, well, they've lived with the conflict a higher percentage of their life than the other children; so, in some ways, don't know any other way as well, given their respective ages of seven and five. But also, by all descriptions, appear to be fairly resilient and able to recover; and, once again, the parties are to be commended.
The separate interests and personality descriptions that this Court received of the plaintiff and defendant are probably fairly accurate but not terribly important to a custodial determination or an access schedule. This Court does not weigh in on whether it's better to spend your time with children in a sporty activity or in a cerebral activity; it's simply not part of the statutory or case law mandate. Children should be well rounded and receive the benefit of a well-rounded upbringing; I think all of us could agree on.
And this Court would even hazard to guess that, while each party has CT Page 5085-kg assumed a role in this family: of the plaintiff being perhaps the more cerebral and the defendant perhaps being the more sporty, each party is capable of offering both kinds of activities; both the active and the more passive activities to each of the children in the time that they spend with the children. The children would not see their parents as two-dimensional individuals, as you've attempted to portray yourselves or portray each other as in this courtroom. And it would do both of you a disservice as parents to think that that is all you have to offer your children.
The Court notes that it's been requested that the dog, Muldoon, travel with the children as they travel back and forth between the parents. I'm not going to order that; I'm telling you now because all of the living arrangements are not yet intact and Muldoon may not be welcome everywhere. And Muldoon also may be an element of discipline for the children; Muldoon may come sometimes and may not come other times. So, I will leave to the parents who are, after today, are going to be joint legal custodians, their best judgment as to when Muldoon will travel and will not travel. And I think that that's the best choice on that.
The Court was presented two witnesses in the nature of expert testimony, Ms. Raider, the family services counselor, and Dr. O'Callaghan (phonetic), who is a PH.D. The Court makes the following findings regarding Brian O'Callaghan. The Court could not find his recommendations credible, or even reach them as credible recommendations, as a result of the following findings. Not withstanding, Mr. O'Callaghan supposed to be functioning as an independent evaluator, therapist, assistant to this family; he inserts as a matter of course and philosophy his personal agenda as a divorced father. And therefore, he therefore fails to remain objective as both a treating therapist and an evaluator.
In order to be able to discern whether this philosophy he brings is valid, this Court would then have to evaluate his personal circumstances; and that's the problem with injecting personal philosophy and experience when you are a professional into a family, a therapeutic, or evaluating relationship. It also violates the very principles of the American Psychological Association, which is the organization that governs his work.
Further, Dr. O'Callaghan had a preconceived preference, not just to joint legal custody, but also to joint physical custody without any regard to the age or other specific developmental milestone issues or needs of the respective four children in this family. And, while our law presumes joint custody, joint legal custody is in the best interest of CT Page 5085-kh children, that does not address the issue of the physical residence and needs of the children as they may be effected, because of their temperament, their parent's abilities or weaknesses or strength as parents, because of their educational and growth issues, because of their emotional growth issues, because of things as mundane of where their friends live and don't live, but very important to children.
The inability of Dr. O'Callaghan to factor the individual needs of these four children and this family first, rather than bringing this preconceived notion to the family, is a fatal flaw in his work. The last reason why the Court finds Dr. O'Callaghan not credible, and therefore does not reach his recommendations, is that he has a theory of behavior management regarding children, which he brings to each family.
And in this particular family there was a significant dispute, which approached philosophical magnitude between the parties as to the proper manner of behaviorally managing the children; what you folks kept calling disciplining the children. And, as a result, he could not be objective in weighing the various considerations that plaintiff brought to the table and the defendant brought to the table. And, in fact, the irony is, while he was called as the plaintiff's witness, his preconceived notions, in regard to this, distorted his view in many ways towards a style of behavioral management which may have been inconsistent with what the plaintiff himself testified to; and that was a real irony.
The Court will note that, as another individual who spent time with this family and with these children, he did bring valuable evidence to the Court by way of his factual evidence and observations. However, the Court does not reach his recommendations as credible from an expert.
The other expert who testified before the Court in regard to the, what I'm going to broadly refer to as the custodial issues, which are really not custodial issues but access issues, was the family relations counselor, Ms. Raider, Leshe Raider. She prepared her report as a result of a Court order and completed it on or about the end of December; I think it was December 23, 1999, although it was not filed with the Court "til mid January of this year.
The Court does not have any similar kinds of critical observations of the manner of Ms. Raider's approach to her work. It was consistent with an approach of an objective individual whose views were not clouded by any preconceived notions of any particular philosophy, other than the style of her report; the Court notes, meets the customary style of the Family Services Division and Court Support Services Division, and is CT Page 5085-ki therefore consistent with that.
Her observations regarding the children, while only a result of her particular incidences of being with the children, were not inconsistent with the observations of the children of Dr. O'Callaghan in his factual observances of them. And the same thing comes across from both of them; and that is that these are children that work well together occasionally and have occasional acting out behavior, particularly by the two boys, but James, more often.
This Court is not going to construe what causes the acting out behavior as a result of one or both parents, or either of the parents; other than the fact that the Court notices that the parties are going through this conflict while these four children are attempting to get along with each other. The issue that came to this Court was whether the behavioral management or discipline by each of the parents was appropriate for the caretaking of the children, and how this Court should take that into consideration in structuring the custodial or access issues.
The Court notes at the outset the following before approaching that issue. And that is the Court accepts and finds that the defendant mother has been historically the primary caretaker for these four children. And been charged with a hon's share of the obligation of meeting their day to day responsibilities as a part of an understanding of the roles of each of the parties in their marital familiar undertaking. And that the plaintiff, while not a disinterested parent, was charged with a different responsibility and that was to be the primary breadwinner. And each party went about their job fulfilling the roles and responsibilities to this family.
The unfortunate circumstance, from the plaintiff's point of view that he finds himself in when the Court makes such a finding is that at the breakup of his marriage, the role that he has taken may not seem so rosy and wonderful in a consideration now of not necessarily living under the same roof with the children on a day to day basis. And even if not seeing them all day long, at least being able to appreciate them on a day to day basis and have that contact. That's the problem that the parent who goes out of the home and becomes the breadwinner faces when the marriage falls apart; and the Court is not unsympathetic to that.
However, the issue is not what's good for dad and what's good for mom, but the issue is what's good for the kids. And it is not a referendum, therefore, on who is a nicer person or any of those sorts of things in the normal family within the normal range, which I would suggest your CT Page 5085-kj family reflects; we don't have any psychotic behavior or things of that kind of nature.
Now, the problem becomes in structuring an access schedule that insures that these children continue to have the benefit of the parental judgement, parental nurturance, parental love and support on as frequent a basis as possible for the children without disturbing, unnecessarily so, those things which are fundamentally so about children; and Ms. Raider refers to them. And that is children need a sense of stability on a day to day basis, on a week to week basis, year in and year out. And when that sense of stability is unearthed and becomes disturbed, it doesn't matter how much time the children are spending with each parent. They are dealing with a child who has been disturbed: And that is fundamentally unfair to the children. And so, custodial orders attempt to reflect this absolute need for stability that children have.
Yours is a difficult circumstance because of the age range of your children. The needs of a five year old are significantly different than the needs of a twelve year old; and for different reasons. A child going into adolescence, in testing the limits of parental authority as he finds his individual life coming into adulthood, are very different needs than the needs of a five year old who still lives very firmly a lot of her life in fantasy land.
However, what's important is that there is a fundamental need of these four children to stay together. And the Court then must construe that the five year old's need for a more profound sense of stability on a minute to minute, day to day, basis is not inconsistent with what the twelve year old needs.
A twelve year old may be more flexible. A twelve year old can stay out later at night. A twelve year old's friends can find the telephone number of two different houses to call to track down the twelve year old friend. James' friends can do that. Lily's new found friends will never be able to do that at age five with the same facility and ease that a twelve year old can. These are things that you may not think about, but your kids think about them if they lose their friends. Your kids think about them if their lives are disturbed.
And when we talk about the needs of stability of children, they're far more profound than just the simple question of, am I going to see my mom, am I going to see my dad. Your kids are going to see both of you. You're both going to remain actively involved in their lives; that has never been an issue from day one of this trial, that is clear to me. CT Page 5085-kk
This Court is going to hazard to say that this trial has not been about the kids. This trial has been about that house, and what that house represents; and it is one of the most unfortunate circumstances I have ever seen. While we all worry about issues of immortality and what we're going to leave behind, I'm going to hazard to say that both of you will agree that what you ultimately leave behind is your four kids and whatever legacy of family they provide you. And the house and all of the beauty that's been created in it ultimately does not matter; it's fleeting, it'll be gone in the next ice age.
Your family line is what provides you the gratification and the sense of immortality that we all seem to seek for. If you learn no lesson out of this dissolution of marriage, and you learn that, then I think that you may create a better balance in your choices of what issues you should be fighting over and not fighting over, what issues you should bring to the table when you have to make joint legal custodial decisions from today forward. This Court has a high level of confidence that you can do that ultimately; it's going to be a little hard at first.
The Court agrees with Ms. Raider that, by observing you and listening to the evidence, that on major joint legal custodial decisions, major issues affecting your children, that you will be able to come to an agreement. It's continued success will require both of you to value each other's opinion and what you offer your children by way of simply fulfilling the role of mother and father. And the continued success of your ability to make major decisions for your children is to believe that each of you hold value for your children.
Now, the issue of discipline, coming back full circle; circle; if you think I forgot it I didn't. The issue of discipline in this family between the two, of you, while important in a philosophical sense, would not be important in the long-term for your children if you each support each other and had supported each other.
Mr. Maliszewski wants this Court to be terribly concerned about the rare, and this Court will characterize them as rare, rare incidences in which Ms. Maliszewski's yelling to get four kids organized, or yelling at them in anger, occasionally one or both or more, flew off the handle and resulted in a whack or some kind of physical hit.
There is no doubt that no scar was left, no physical mark was left; whether it left an enduring emotional mark in the children, we don't know. or in James in that particular incident that was replayed over and CT Page 5085-kl over. It certainly did in both Ms. Maliszewski and Mr. Maliszewski; and that's the problem. Instead of looking at this as something that you were in the joint enterprise of doing, it became a divisive issue between the two of you.
These children must know when Mr. Maliszewski did not support their mother in attempting to impose discipline and structure on the children. And once they knew that there was a wedge between the parents, her ability to effectively discipline the children was undercut. So, both of you committed a sin in your parenting, if I can put it that way without attempting to overlay the word. Ms. Maliszewski lost her temper. Mr. Maliszewski undermined her as a parent. Neither were good choices. Neither of them make you, ultimately either of you, the appropriate or inappropriate custodian of these children.
In a home that you are not together in, when each of you in your respective homes are parenting, each of you will effectively find the tools to control the behavior of your children, because you'll no longer be in a situation where there's conflict between the two of you over it. This Court will go one step further, however, and say, if there is a loss of privilege to a child as a means of discipline, it is absolutely incumbent on the other parent to support that in the flow back and forth of these kids between your households. or you will do forever some kind of damage to them.
There were other things that this Court could point to that were indications of occasional lapses and judgement by each of you as parents; but it has a condemnative quality to it. And there's no reason to enlarge upon those issues, because the Court finds, ultimately, that these issues were not dispositive of the custodial decision in this case, and simply symptomatic of a difference in philosophy and a decision to not function as a cohesive parental unit for your children.
When this Court considers then, under these circumstances, what is the appropriate circumstance for the custody of these children, the Court accepts the proposal of joint legal custody and does issue orders, which in this Court's mind provides for the necessary structure and stability that these children need on a day to day basis, particularly as they go through the process of their education and the rigidity of the school's structure.
This Court is concerned about providing too much back and forth time for the children and will not do so. And finds, particularly, that they need, based upon their disparate ages and the youth of the children, a CT Page 5085-km primary physical residence so that they have a sense of enduring stability.
The assets of these parties amount, basically, to the house and Mr. Maliszewski's IRA. There are other assets, the Court will go through the values, but the context in which the financial orders are entered recognize those as the two major assets. The property at 73 Plumtrees Road, the parties have stipulated has a value of $187,000.
This is a house that was bought by the parties in much disrepair; and over a slow process, since its purchase, it has had a variety of repairs committed to it. The evidence need not be repeated as to which rooms have been fulfilled in terms of a more completely renovated and which not. The bottom line is that this family has found this house to be livable; has functioned within this house; the children have grown up in this house; and there is nothing present in the home at the present time that any party would suggest poses a significant health or safety risk to any of the parties, and particularly to the children.
It is the home that they know from their birth, essentially. It was initially purchased with help from Mr. Maliszewski's mother that — strike that, family, that has been forgiven as a gift and ultimately has merged into the value of the property. It has the first mortgage on it and also the second mortgage, by way of a home equity loan as a result of the failed enterprise of Abbington Antiques.
Mr. Maliszewski is a skilled woodworker; the phrase I believe is a cabinetmaker, even if the work is actually largely by way of restoration of antiques and other valuable products. His education is consistent with that area, having acquired both a Bachelors and having done some study in — Bachelors in Fine Art, and having done some study at Cambridge as well. His skill is mostly a self-learned skill, learning from other skilled craftsmen; and it has treated him well as a business that he has been able to earn approximately 62 to 63 thousand dollars in recent time, as evidence by his 1998 tax return.
The Court notes in the 1998 tax return that there's also an indication of some modest depreciation of assets owned by his business, which is himself indeed, the London Joiners; including a modest depreciation of the Jeep. There is no other significant deduction for unusual expenses indicated on his tax returns to suppress his income. He has also attempted to ameliorate his income, as indicated, through purchase of ancillary items of value and selling some of them through store and some through Internet auction. CT Page 5085-kn
The defendant has an education, which basically has taken her shy of the New Zealand equivalent of a high school diploma, but then ameliorated her skills by learning hair styling. However, this is not a business that she has been engaged in. She's largely not employed outside of the home for the vast majority of the marriage, being pregnant 5 times and raising four children. The efforts at auction sales and now as an administrative assistant or personal assistant or whatever rich people call it, to this individual has resulted in her having income at a level far in excess of what her education might have otherwise provided for on an entry level job. Eighteen dollars an hour would appear to be her maximum earning capacity at the present time.
The plaintiff urges the Court to accept that she can work 35 hours per week. While she may ultimately be available 35 hours per week, the evidence discloses that she works at the whim of her employer, which sometimes does not allow for the 35 hours per week and does not make her available with sufficient advance notice to be able to supplant that with other work. Therefore, the Court finds her financial affidavit, at the present time, fairly displays her present earning capacity.
The parties also have, as indicated, their IRAs. Mr. Maliszewski's, at least at the end of last year, was valued at $38,172; and Ms. Maleszewski's, as of February 22nd, at $3,727. The law requires the Court to find value as of the date of dissolution, which is today, and the parties have asked the Court to accept these valuation dates. The Court will accept them and use them for today's date. However, cautiously mindful, that depending upon how these IRAs have been invested, it is a very unstable, volatile world out there economically and they may reflect current value or may reflect something less than or greater than current value. However, for purposes of the equitable orders here' and the stipulation of the parties to use these dates and these values, the Court will do so.
Ms. Maliszewski has been driving the 1993 Chevrolet Suburban, which the Court will find the value of $12,000 with a note of approximately $2,243 on it. Mr. Maliszewski has been variously driving the 1987 Jeep and the 1979 Volvo. The latter having a value of $500 and the former having a value displayed on his financial affidavit of $700. The Court will accept that value because we don't have current depreciation tables from 1999 for the Jeep to indicate whether, based upon depreciation standards from the business, whether it's right on point. It's certainly close enough and the Court will therefore accept the value. CT Page 5085-ko
Mr. Maliszewski owns London Joiners, Ltd. It is a sole proprietorship, which he owned prior to the parties' marriage. There was, however, a source of income to him on the 1998 tax return, which had something called Maliszewski Associates Limited Partnership, as a source of $1,037.58 on either interest or ordinary dividend. It's not clear whether that entity continues to exist, whether that was a one-time income source, or whether that is another name for the business. The Court notes that it did produce, however, in 1998 just over $1,000 of income.
The Court finds, based upon the evidence before it — strike that. The cases of Krafick versus Krafick indicates that this Court is to value all assets at the time of dissolution of marriage. The case of Bornemann versus Bornemann indicates the Court need not find a value when counsel has failed to provide sufficient information for a finding of value, but that if the Court does do so, it should consider appropriate valuation techniques.
The valuing of a sole proprietorship, as counsel all know, can be done in a variety of ways. Mr. Ball, in his closing argument, made some comment about the Court finding some value to good will. This Court can not make a finding of value as to good will; it has insufficient evidence before it to do so. There are, however, hard assets of London Joiners, which were elicited through cross examination and which the Court can find value to.
The Court does know that the heavy machinery owned by Mr. Maliszewski in London Joiners was largely — or many of the pieces were owned by him premaritally. And the depreciation schedules do not include them, which would indicate that they have been long ago depreciated and that his indication of values, therein, are indicative of that. The Court did receive, however, evidence as to values of that machinery; the other equipment, by way of hand tools, some of them mechanical or machinery; and many fine hand tools; and many hand tools not necessarily as fine; wood; some furniture inventory; some inventory of the glass as referred to; cash on hand; and some inventory as to scrimshaw.
In consideration of all of the evidence, the Court does find that the hard asset value, which is the only value the Court has to provide — the only evidence the Court has in terms of acceptable means of providing value and it's akin to a book value, would be $41,000. And no evidence was adduced to outstanding indebtedness to net against that. Therefore, that is the value found. CT Page 5085-kp
There are various antiques and furnishings; which, based upon the evidence before the Court, which was fairly minimal, the Court finds has a value between 5 and 6 thousands dollars, total. They include the art Nouveau item, the Welsh hutch, the French desk, the farm table, the two bureaus, the slant-front desk, the DePino paintings and the key collection.
There are UGMA equitable retirement accounts, that have been managed by the plaintiff, that have an approximate value of $12,000 for the benefit of the minor children. The parties each have respective bank accounts, separate from the London Joiner's account, which was part of the evaluation that the Court already did. And these accounts the Court is not ascribing value to, because both parties have been flushing money in and out for bills and they don't have any real sense of basis thereafter.
Mr. Maliszewski has some Boeing stock of about $700. And there is life insurance that Mr. Maliszewski has and, based upon the evidence, the Court finds that Mr. Maliszewski did violate the automatic orders by reducing the amount of his life insurance without Court order or written stipulation of the parties. The life insurance is currently for the benefit of the four minor children. Each party has listed various debts on their respective financial affidavits; and the Court finds the values as indicated on the respective financial affidavits. The attorney for the minor child has indicated that her bill is in the range of approximately $2,000. Defendant's counsel is — defendant, through counsel and her claims for relief, is seeking attorney fees from the plaintiff in the approximate amount of about $5,000.
The last issue to be dealt with before the orders is, perhaps, the cause of the breakdown of the marriage. Mr. Maliszewski has a keen hobby, because it hasn't produced income yet, so we'll call it a hobby, in the forensic area of photography work that he does. And this work is clearly important to him, to his sense of self, and his personal identity; and probably provides him some sense of gratification at the end of a day, although the woodworking should too.
The defendant has been concerned that the amount of time that Mr. Maliszewski has invested himself in that has resulted in, essentially, a polarization between the parties and his unavailability to her and to the marriage. Mr. Maliszewski has believed that the defendant's occasional volatility, emotionally, has been a stress, from his point of view, in the marriage. CT Page 5085-kq
It would be impossible for the Court to pick between these two versions, as to which is the cause of the breakdown, because that's not how marriages breakdown. Marriages breakdown because parties stop nurturing their marriage and stop putting the needs and interests of their spouse in a position at least equal to, if not paramount to, their own needs. And it's selflessness and humility in the ability to display both characteristics that cause parties to start to recede within the shell of themselves, and no longer nurture their marriage as a part of themselves. And that's what's happened in this family.
How or why it happened is not terribly clear, and would not have caused the Court to find one or the other party more at cause for the breakdown of the marriage, which is the only reason why this Court would inquire further. And so, as it received the evidence, it declined to do so; and the Court does decline to find either party more at fault for the breakdown of the marriage.
It is clear that the parties view life in different ways. And the vitality of their respective views when they were younger perhaps had been lost on each other through the aging process and the enterprise of raising kids and financial pressures and the like. But neither party is to blame for it, individually or solely. The failure of a marriage is simply a mutual tragic result. And those are the Court's findings regarding this.
Parenthetically, the Court will not find, necessarily, that Mr. Maliszewski's earning capacity could be higher if he wasn't engaged in what I'm referring to as a hobby, because it's not presently income producing and that's what the IRS calls it, the forensic area of photography work. The energies necessary for producing income and the decision to pursue a job are not always the same energies and time that would be otherwise spent if it wasn't spent on hobbies.
It could be argued, similarly, that Mrs. Maliszewski could be working harder in the winter if she wasn't taking the kids skiing or going skiing herself to get her licensing up so that the kids could go skiing and enjoy it herself. She enjoys skiing. Mr. Maliszewski enjoys his hobby enterprise. Each party is entitled to their individual pursuits. And maybe if each had respected the others a little more, we wouldn't be here today. But I suspect it's bigger than that.
The Court enters the following orders. The Court orders that the parties shall retain and enjoy joint legal custody of all four minor CT Page 5085-kr children. The Court does designate the defendant as primary physical custodian of the minor children. The Court notes that the parties both intend to live in the town of Bethel. The Court therefore orders that if either party intends to remove themselves, their residence, out of the town of Bethel, they shall provide the other party a minimum of 60 days notice in writing of the intention to do so and where they intend to relocate to.
The Court further orders that neither party shall take the minor children out of the United States without the approval of the other party or — strike that — consent of the other party, which shall not be unreasonably withheld. The Court further orders that each party shall look to the other parent as the first source for childcare, when the children are in their respective care, if the schedule of one or more of the children is in conflict, such that the parent in custodial care at the time can not have all four children with them. It's the best way to put that.
The Court orders that the following shall be the schedule of access upon the parties no longer living in the same residence. And that is that, starting the first weekend, Mr. Maliszewski shall have the children — and it will be alternating weekends, so that you know, with him from Friday after school until school Monday morning. If Monday is a legal holiday, on his time or on Ms. Maliszewski's time, it will be until the end of the day Monday, that includes to each of their weekends; and that is an alternating weekend schedule between the parties.
The Court further orders that Mr. Maliszewski shall have the children with him every Thursday after school until Friday morning. The following holiday vacation and school break schedule supercedes that regular weekly schedule. First of all, Mr. Maliszewski shall have the children with him every Father's Day and Mrs. Maliszewski shall have the children with her every Mother's Day.
On the following holidays the schedule shall be, and I understand we just passed Easter, I'm aware of that, the following shall be the schedule. Mrs. Maliszewski shall have Easter in even years, Mr. in odd years. Mrs. shall have Christmas Eve in odd years and Mr. in even years. I'm going to switch to mom and dad, it's easier. Mom shall have Christmas Day in even years and Dad in odd years. Thanksgiving, Mom shall have the kids in odd years and Dad in even years.
The following holidays apparently do not necessarily fall on the Mondays that I indicated just the overflow on Mondays from the weekends. CT Page 5085-ks On Labor Day Mom shall have the kids in even years and Dad in odd years. On Veteran's Day Mom shall have the kids in odd years and Dad in even years. I am aware that the actual holidays of Memorial Day, Fourth of July and Columbus Day, don't necessarily fall on Monday but they are celebrated on Mondays and, therefore, they will stay with the parent who had them, the kids, that weekend prior.
ATTORNEY BALL: Excuse me, your Honor, Labor Day is always a Monday.
THE COURT: Tuesday. It's the first Tuesday of September, every year. Are you okay with that?
ATTORNEY BALL: Yes, ma'am.
THE COURT: Okay, thank you. I guess you never had a blue-collar job.
Okay, breaks; December 26th through January 1st, Mom shall have in odd years, Dad in even years. And I understand January 15th is the other year, but just stay with whatever the year was on December 26th, okay, don't switch that day. On the April vacation, Mom shall have the kids in even years and Dad in odd years. If the school switches back to it, or switches to a two vacation schedule, like February and April, the intent is to alternate them; and the parties should be able to do that on their own without coming back to Court.
Summer — and the summer is as construed by the children's being out of school to the beginning of school. Each party shall be entitled to have the children for three weeks of vacation time. And, yearly, except for this year, Dad gets first choice and gives his notice by February 15th to Mom; and then she gives her notice back to him of her three weeks by March 15th This year, Mr. Maliszewski has to give his notice by May 15th and Ms. Maliszewski back by May 31st. The reason, so that the parties are aware of it, for the early dates in February, it would seem awfully early to Dad normally, is because if and when you ever get on a camp schedule for these children, camps fill up that early. So, it gives you the opportunity to work them around that.
Now, the parties shall each be entitled to daily reasonable telephone contact' with the children; it's anticipated that each would like to make their phone calls in the evening to say goodnight. So, therefore, if you're traveling with the children you need to make the appropriate accommodations if you're on the Cape or wherever you might go, so that that can be accomplished for the benefit of the children. CT Page 5085-kt
The Court orders that Mr. Maliszewski shall transfer to Mrs. Maliszewski all of his right title and interest into the real estate at 73 Pluintrees Road, Bethel, Connecticut by Quit Claim deed within 30th days. She shall indemnify and hold him harmless on all expenses relating to the property with the exception of the following order.
Mr. Maliszewski shall, through June 30th, keep all of the expenses of the home current that he has currently been obliged to pay; and that includes insurances, and auto insurance, and life insurance. And the real estate taxes on the property shall be current, by and through, July 31st as a part of Mr. Maliszewski's obligations.
Mr. Maliszewski shall transfer to her the title of — Mrs. Maliszewski — of the Suburban and she shall transfer to him, to the extent these are necessary, counsel, the titles of the Jeep and the Volvo. Each party shall remain the owner of their respective IRAs. Mr. Maliszewski shall remain the owner of all his right, title and interest into London Joiners and all of the assets therein.
Each party shall remain owners of the respective bank accounts. Mr. Maliszewski, as the custodian of the UGMA accounts, shall account yearly to Ms. Maliszewski as to the status of the accounts; no withdrawals shall be made from those accounts by Mr. Maliszewski without the written consent of Ms. Maliszewski.
The Court orders that Mr. Maliszewski shall pay alimony to Ms. Maliszewski in the amount of $75 per week for a period of seven years, which shall sooner terminate on Ms. Maliszewski's death, Mr. Maliszewski's death, the parties remarriage — strike that — Mrs. Maliszewski's remarriage, or her cohabitation as defined, however, by a statute and case law with an unrelated male.
The Court, based upon the findings of earnings, orders Mr. Maliszewski to pay the guideline's presumptive child support order of $301 per week to Mrs. Maliszewski. That payment shall commence on the seventh day after he vacates the home. Mr. Maliszewski shall vacate the marital home on or before June 30, 2000; and he may, however, continue to have access to his work area, the garage and the back studio, through and to August 31, 2000. He shall, so long as he has access to the studio, pay an additional $25 per week to account, in very rough ways, for his utilization of utilities by way of electric and the running of equipment there. His access to the studio, after he vacates the property as a residence, shall be between 9 a.m. and 4:30 p.m. Monday through Friday; this is not access CT Page 5085-ku to the home itself.
The child support order of $301 per week I'm going to hazard, even though counsel haven't told me, shall be by contingent wage withholding. However, Mr. Wu, you need to get an advisement in, even though it's contingent, because the law requires him to sign one, so. if you would do so.
Ms. Maliszewski shall, with the assistance — to the extent that it's necessary for Mr. Maliszewski, pursue the Husky insurance until it is in place for the children. The child support guidelines provide that Ms. Maliszewski shall pay the first $100 per year per child of health expenditures for the minor children. The Court, however, given the nature of these orders and the length of the time the parties are going to continue together, that shall not take effect `til the year 2001. Instead, in the interim year the percentages will, for the balance of 2000, take over. And that is, Mr. Maliszewski shall pay 43% of health expenditures of the children that are not paid by insurance and Ms. Maliszewski shall pay 57%; and then the first $100 per year per child shall kick in in 2001.
Mr. Maliszewski shall maintain the life insurance he currently has in effect, at the rate of $25,000 per child, for the benefit of the minor children during each child's period of minority.
The Court grants the dependency exemptions as follows and orders them. The plaintiff shall have the dependency exemption of the second and fourth children and Ms. Maliszewski shall have the first and third children. Mr. Maliszewski shall have these dependency exemptions, provided he is current in his child support, by December yearly. That, however, is not construed to be an order that shall allow arrearages to develop; and other remedies, as they may exist, are available.
Mr. Maliszewski has an arrearage in the Court order of $75 per week, which the Court construes to be for 16 weeks, based upon the evidence. It may have accrued further since then, but the Court finds an arrearage of $1,350, which shall be paid to Ms. Maliszewski on or before May 15th of 2000.
The Court orders that the art Nouveau item, the Welsh hutch, the French desk, the farm table, the two bureaus, the slant-front desk, and the DePino paintings shall belong to Ms. Maliszewski. The key collection shall belong to Mr. Maliszewski, as the result, and any other items that were not so indicated that constitute his bone yard. In other words, CT Page 5085-kv furniture that's not in the house, but available for restoration, either at Pound Ridge or his place at Bethel.
The balance of the household furnishings, there has been no testimony about, and the Court is constrained to therefore issue the following order. Whatever the children have in their rooms will remain in the house. Whatever is in the kitchen will remain in the house and if there is a second set, like a second set of silverware, a second set of dishes, and those sort of things, then Mr. Maliszewski shall be entitled to the second set of these items. The piano is clearly Mr. Maliszewski's and ordered to be so, based upon the limited evidence that I had. As to the balance of the furnishings, the parties shall come to an agreement as to who shall get what.
The parties have been living, in some ways, separate during this period of time. And so, therefore, the personal items and bedding and things of that nature, that each has respectfully enjoyed, is ordered shall stay with that party so that each have a place to sleep when they no longer live together.
Each party shall pay their own attorney's fees. The shall each pay one half of Attorney Foster's bill, as they agree with her on it, which shall not be less than $2,000.
ATTORNEY FOSTER: Thank you, your Honor.
THE COURT: You're welcome.
The Boeing stock is Mr. Maliszewski's and shall remain his.
Counsel, do you think I missed anything?
ATTORNEY WU: Your Honor, I didn't think you missed anything, but I had two or three questions.
THE COURT: Go ahead.
ATTORNEY WU: What was your intention with regard to the equity loan?
THE COURT: Mrs. Maliszewski is paying it. I thought I said that; that she indemnify and hold him harmless on all the expenses, except for that he's got to keep everything that he's been paying current `til he leaves or June 30th. CT Page 5085-kw
ATTORNEY WU: And I assume it goes without saying Mr. Maliszewski — some of that personal property, his books, for example are his books?
THE COURT: His personal memorabilia should go with him, absolutely.
ATTORNEY WU: And there is no piano, just for the record, that was disposed of some time ago.
THE COURT: Okay, well, I wouldn't know that from the evidence.
ATTORNEY WU: And the only thing I missed this, it was on Christmas —
THE COURT: The Christmas schedule?
ATTORNEY WU: Yes, the Christmas Eve and Christmas.
THE COURT: Christmas Eve Mom has in odd years, Dad in even years. Christmas Day Mom has in even years and Dad has in odd years.
ATTORNEY WU: And then there were three holidays you mentioned, Memorial Day, Fourth of July, and there was a third, I missed that third —
THE COURT: Columbus Day, they just go with the Monday schedule, whatever the legal holiday is that's celebrated.
ATTORNEY WU: Thank you.
THE COURT: Mr. Ball, you think I missed anything?
ATTORNEY BALL: I just have one more question, your Honor.
THE COURT: Go ahead.
ATTORNEY BALL: I drove a truck for seven years while going through college and law school. And as I went through my blue-collar job, Judge, before I had this job, for seven years, a teamster at Local 170 out of Worchester, Massachusetts, Labor Day was always a Monday when I drove truck. Now, —
THE COURT: You may be right, I'm checking. CT Page 5085-kx
ATTORNEY BALL: It was always a Monday holiday. However, the second Tuesday of a month was November which was Veteran's Day.
THE COURT: You're right. I stand corrected. Labor Day, however, is going to be an independent holiday still. You're absolutely right. And Veteran's Day is a Tuesday. I stand corrected.
ATTORNEY FOSTER: Your Honor, I just have a brief question. As to the alternating weekends, is the Thursday to Friday an every Thursday night?
THE COURT: Yes, if that was misunderstood, counsel, Attorney Foster is asking — the Thursday night is every Thursday night.
ATTORNEY FOSTER: Thank you, your Honor.
MS. MALISZEWSKI: `Til school on Friday, your Honor?
THE COURT: "Til school on Friday and then every other weekend, right, Friday' to Monday, yes, thank you.
Folks, good luck to both of you and good luck to your kids.
Recess.
(Whereupon Court was recessed)
BY THE COURT: Munro, JUDGE